Ulmer & Berne, L.L.P., and David L. Lester, urging reversal for amicus curiae KeyCorp.

Davis Young and Richard M. Garner, urging reversal for amicus curiae Progressive Preferred Insurance Company.

A. Mark Segreti Jr., urging affirmance for amici curiae Terence D. McLean and Carol M. McLean.

CONSTELLATION NEWENERGY, INC., APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Constellation NewEnergy, Inc. v. Pub. Util.
Comm.,* 104 Ohio St.3d 530, 2004-Ohio-6767.]

(No. 2003–2159—Submitted October 12, 2004—Decided December 17, 2004.)

---

MOYER, C.J.

### Background

{¶ 1} This is an appeal as of right by appellant, Constellation NewEnergy, Inc. ("Constellation"), from orders of the Public Utilities Commission of Ohio ("PUCO") in *In re Continuation of Rate Freeze & Extension of Market Dev.*

*Period for Dayton Power & Light Co.,* case No. 02–2779–EL–ATA, 2003 WL 22142843 (Sept. 2, 2003) (the "MDP extension case"). Dayton Power & Light Company ("DP & L") was the applicant and Industrial Energy Users–Ohio ("IEU") was an intervening party in the MDP extension case. Both DP & L and IEU have intervened as appellees in this appeal, as has Cincinnati Gas & Electric Company ("CG & E"), an electric-distribution utility ("EDU") situated similarly to DP & L.

{¶ 2} The backdrop for this appeal is Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962 ("S.B. 3"), which provided for restructuring Ohio's electric-utility industry to achieve retail competition with respect to the generation component of electric service. S.B. 3 required each Ohio electric utility to file a transition plan with the PUCO that included a rate-unbundling plan providing for separation of the generation, transmission, and distribution components of electric service. See R.C. 4928.31. S.B. 3 provides for a transition period, termed the "market development period" ("MDP"), during which an electric utility's rates are subject to certain regulatory requirements and the recovery of transition costs is permissible. The maximum transition period permitted by statute is five years, beginning January 1, 2001. R.C. 4928.01(A)(17) and (29) and 4928.40.

{¶ 3} On September 21, 2000, the commission issued an order approving DP & L's transition plan. *In re Application of Dayton Power & Light Co. for Approval of Its Transition Plan Pursuant to Section 4928.31, Revised Code,* case No. 99–1687–EL–ETP, 2000 WL 1751554. The order provided for an MDP of three years, ending December 31, 2003, instead of the five-year maximum period, and provided for recovery of regulatory transition charges ("RTCs") and customer transition charges ("CTCs") during the three-year MDP.

{¶ 4} DP & L filed its application with the commission in the MDP extension case on October 28, 2002, requesting an extension of its MDP from December 31, 2003, through December 31, 2005, the latest date statutorily allowed for termination of the MDP. See R.C. 4928.40. Numerous parties intervened in the MDP extension case, including the Ohio Consumers' Counsel ("OCC"), IEU, Constellation, Strategic Energy, L.L.C. ("Strategic"), and the Ohio Manufacturers' Association ("OMA"). The commission consolidated the case with three other related cases. DP & L provided testimony at hearings and, on May 29, 2003, presented a stipulation it had reached with several, but not all, of the parties to the proceedings. The parties to the stipulation included, among others, the commission's staff, IEU, and DP & L. The hearing was adjourned to allow further discovery related to the stipulation.

{¶ 5} Thereafter, Constellation and several other parties (collectively, "CRES

providers")[1] filed a motion to compel discovery from DP & L relating to alleged side agreements among DP & L and its affiliates with other signatories to the stipulation ("CRES discovery motion"). On June 17, 2003, hearings resumed, wherein a PUCO attorney examiner denied the CRES discovery motion.

{¶ 6} At the June 17, 2003 hearings, DP & L presented testimony in support of the stipulation and Constellation and another CRES provider presented evidence in opposition to the stipulation. In its September 2, 2003 order, the commission affirmed the attorney examiner's ruling on the CRES discovery motion; approved the stipulation, with minor modifications; and provided for the extension of the MDP for two additional years, to December 31, 2005, as permitted by R.C. 4928.40(A). The order also required (1) terminating RTC and CTC riders on December 31, 2003, (2) adding the corresponding rates, previously set forth in those riders, to DP & L's unbundled electric-generation service rates, and (3) maintaining shopping credits[2] at then current levels for residential consumers and at increased levels for nonresidential consumers.

{¶ 7} After the commission approved the stipulation, with minor modifications, Constellation filed an application for rehearing, which the commission denied. Constellation timely filed its notice of appeal.

### Introduction

{¶ 8} The main issue in this appeal is whether the stipulation that the commission modified slightly and adopted in its September 2, 2003 order was reasonable. The parties to this appeal agree that the commission's review of the stipulation for reasonableness must meet three criteria: (1) it must be a product of serious bargaining among capable, knowledgeable parties; (2) it must, as a package, benefit ratepayers and the public interest; and (3) it must not violate any important regulatory principle or practice. See *Consumers' Counsel v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 123, 126, 592 N.E.2d 1370, and *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 82–83, 765 N.E.2d 862.

{¶ 9} Constellation sets forth five propositions of law defining the alleged commission errors. Three of the five challenge the reasonableness of the stipulation and two of them challenge the lawfulness of specific provisions of the stipulation.

### First Claimed Error

{¶ 10} Constellation refers to a critical provision of the stipulation that states, "This Stipulation contains the entire Agreement among the Signatory Parties,

---

1. "CRES" stands for "Competitive Retail Electric Service."

2. See ¶ 30-35 of this opinion for a discussion of shopping credits.

and embodies a complete settlement of all claims, defenses, issues and objections in these proceedings." Constellation argues that the foregoing statement cannot be true if, in fact, there were side agreements between the signatory parties that were not disclosed in the stipulation. And, as Constellation observes, it was the possibility that there were side agreements that instigated the CRES discovery motion that was denied on interlocutory appeal by the commission in the order now on appeal. Constellation claims that the commission's failure to compel the requested discovery was unreasonable and unlawful, thereby tainting the commission's reasonableness determination of the stipulation itself.

{¶ 11} Ohio Adm.Code 4901–1–16(B) provides that "any party to a commission proceeding may obtain discovery of any matter, not privileged, which is relevant to the subject matter of the proceeding. It is not a ground for objection that the information sought would be inadmissible at the hearing, if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

{¶ 12} Thus, for the commission to compel discovery, the information sought must not be privileged or irrelevant. The CRES discovery motion sought the opportunity to question a DP & L employee concerning "any agreement between DP & L or its affiliates including its generation affiliate with any of the Signatory Parties to the Stipulation and Recommendation" and the production of any such agreement.

{¶ 13} Constellation argues that the commission cannot make a reasonableness determination regarding the stipulation without knowing the terms of any side agreements among its signatories. Constellation asserts that without this information, the commission's second and third criteria for reasonableness cannot be determined, i.e., whether the settlement, as a package, benefits ratepayers and the public interest and whether the settlement package violates any important regulatory principle or practice. Constellation complains that without knowing the terms of any side agreements, the commission cannot even define the settlement package referred to in its second and third criteria for testing the reasonableness of a stipulation.

{¶ 14} The simple logic of Constellation's arguments is appealing. Yet these arguments were addressed by two specific findings of the commission in its order on appeal. The commission first determined that settlement communications should be privileged to encourage negotiations leading up to a stipulation, and based on that determination, the commission found that "the information sought to be discovered by the CRES discovery [motion], being information related to the negotiation of the proposed stipulation in this matter, is privileged and therefore not discoverable." The commission then stated: "In addition, even if it were not privileged, the information sought would not be relevant to the

determination of this matter. It appears to the Commission that the result of the proposed discovery would be to determine the motivations of the various parties to enter into the stipulation. * * * To the extent that the movants' assertion is correct that they are merely attempting to determine the nature of the entire package that is being presented to the Commission for approval, the Commission would note that no agreement among the signatory parties to the stipulation can change the terms of the stipulation. Either the terms of the stipulation are, on their face, beneficial to the ratepayers and the public or they are not. Even if there were side agreements among the signatory parties, those agreements would not change the public benefit or detriment of the stipulation. The Commission will evaluate the terms of the stipulation as they appear on its face. Therefore, the discovery sought in the CRES discovery appeal is not relevant to the subject matter of these proceedings."

{¶ 15} Thus the commission determined that the information sought by discovery was privileged and, moreover, was not relevant. As a result, it would not compel discovery for noncompliance with the requirements of Ohio Adm.Code 4901–1–16(B). The CRES discovery motion did not meet the requirements of Ohio Adm.Code 4901–1–16(B) and the commission was justified in denying discovery.

### Second Claimed Error

{¶ 16} Constellation argues in its second proposition of law that the commission "unreasonably and unlawfully violated the Ohio Supreme Court's admonition in *Time Warner AxS v. Pub. Util. Comm.* (1996), 75 Ohio St.3d 229 at 233, [661 N.E.2d 1097] Footnote 2, by approving a stipulation which arose from settlement meetings where interested parties were excluded." In the footnote, in dicta, the court said:

{¶ 17} "[I]n the interest of judicial economy and given the extensive briefing and arguments of the parties, we feel compelled to note our grave concern regarding the partial stipulation adopted in the case at bar. The partial stipulation arose from settlement talks from which an entire customer class was intentionally excluded. This was contrary to the commission's negotiations standard * * * and the partial settlement standard endorsed in *Consumers' Counsel v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 123, 125–126, 592 N.E.2d 1370, 1373. The benefits of alternative rate treatment and deregulation for the local exchange company under R.C. 4927.03 and 4927.04 are to be balanced by an equal offset of increased competition, infrastructure commitments, and other benefits to the ratepayers. R.C. 4927.02. This balancing did not occur. Ameritech managed either to settle its competitive issues or defer them until a later date, all without having its competitors at the settlement table. Under these circumstances, we question whether the stipulation, even assuming the commission's

authority to approve it, promotes competition in the telephone industry as intended by the General Assembly. We would not create a requirement that all parties participate in all settlement meetings. However, given the facts in this case, we have grave concerns regarding the commission's adoption of a partial stipulation which arose from the exclusionary settlement meetings."

{¶ 18} Constellation says that "this [case] is the same as *Time Warner*," asserting that four CRES providers, including Constellation, and the OMA were intentionally excluded from "secret" settlement meetings. By asserting intentional exclusion of interested parties from settlement negotiations, Constellation indirectly challenges the ability of the settlement agreement (the stipulation) to satisfy the first test of reasonableness: Is the settlement a product of serious bargaining among capable, knowledgeable parties?

{¶ 19} Constellation and intervening appellee DP & L agree that Constellation was not invited to participate in, and did not participate in, settlement negotiations that took place on May 22 and 23, 2003. (May 23 was the Friday before the Memorial Day weekend and the stipulation was signed on the first business day after the holiday.) However, the two parties disagree as to why Constellation was not invited to participate in the May 22 and 23 settlement negotiations.

{¶ 20} Constellation argues that it and several other participants in the MDP extension case were purposefully and selectively *excluded* from the May 22 and 23, 2003 settlement negotiations. Intervening appellee DP & L argues that Constellation and other parties were *not included* in the two-day settlement negotiations, merely because they had not responded to invitations to participate in earlier settlement negotiations.

{¶ 21} The parties agree only that, for whatever reason, Constellation was not invited to participate in the May 22 and 23 settlement negotiations and Constellation did not participate in those negotiations. Standing alone, these facts are not comparable to the facts in *Time Warner* that warranted the court's admonition in footnote 2.

{¶ 22} Constellation next claims that the court's footnoted admonition in *Time Warner* was ignored in this case because "interested parties" (including Constellation) were excluded from settlement negotiations. Assuming for the sake of argument that such an exclusion occurred, it was not directed at an "entire customer class," which was the factual predicate in the *Time Warner* footnote. As the commission observes, "Since representatives on behalf of DP & L residential, commercial, and industrial customers all *participated* in the settlement process *and signed* the Stipulation, no entire customer class was excluded. The factual predicate upon which the *Time Warner* admonition was premised is simply not presented in this case." (Emphasis sic.)

{¶ 23} In support of the commission's contentions, intervening appellee DP & L identifies the following classes that were represented in settlement negotiations: residential customers, low-income customers, commercial customers, industrial customers, and CRES providers. DP & L also identifies the representatives of each of those classes and points out that those representatives not only participated in settlement negotiations but also signed the stipulation.

{¶ 24} The conclusion we draw from the foregoing is that the admonition in the footnote in *Time Warner* is not applicable under the facts of this case.

### Third Claimed Error

{¶ 25} Constellation complains that the "Commission has unreasonably and unlawfully violated Section 4928.39, Revised Code by permitting DP & L to recover additional transition revenues without commission approval." According to Constellation, this complaint is manifested in two issues.

{¶ 26} The first issue involves transition-cost recovery. In DP & L's transition-plan case,[3] the commission determined the amount of transition-cost revenues and approved two tariff riders, one to collect RTCs and the other to collect CTCs, and set a deadline of December 31, 2003, for termination of RTC and CTC collection. Constellation argues that the "Stipulation * * * follows the transition case order and terminates the CTC and RTC riders in name; however, the * * * Stipulation then incorporates the actual fees from the CTC and RTC rider into the generation rate so that all customers will continue to pay DP & L the same amount of money as if the RTC and CTC are still in place." Constellation characterizes this as "slight [sic, sleight] of hand" that allows DP & L to continue to collect, albeit under a different name, RTC and CTC beyond the earlier-established deadline of December 31, 2003. Constellation argues that to allow DP & L to continue to collect RTC and CTC for the balance of the extended MDP is impermissible because it enables DP & L to recover additional transition costs without a showing that DP & L has incurred additional transition costs. Constellation argues that approval of the stipulation shows a preference for form over substance.

{¶ 27} Despite Constellation's assertions to the contrary, Section II.B. of the stipulation provides, "DP & L will incorporate into revised tariff sheets the Staff Recommendation that terminates the Company's riders for the Regulatory Transition Cost ('RTC') and Customer Transition Costs ('CTC') and adds the corresponding rates detailed in those riders to the electric generation service

---

3. *In re Application of Dayton Power & Light Co. for Approval of Its Transition Plan Pursuant to Section 4928.31, Revised Code & for Opportunity to Receive Transition Revenues Authorized under Sections 4928.31 and 4928.40, Revised Code,* case No. 99–1682–EL–ETP (Aug. 31, 2000).

rates, effective on a service rendered basis (subject to proration) beginning on January 1, 2004."

{¶ 28} Thus, pursuant to Section II.B. of the stipulation, the transition-cost-recovery riders were indeed terminated. Moreover, the part of Section II.B. that adds the corresponding rates contained in the riders to the generation-service rates is mandated by R.C. 4928.34(A)(6), which states: "[T]he total of all unbundled components in the rate unbundling plan are capped *and shall equal* during the market development period * * * the total of all rates and charges in effect under the applicable bundled schedule of the electric utility * * * in effect on the day before the effective date of this section, including the transition charge determined under section 4928.40 of the Revised Code, adjusted for any changes in the taxation of electric utilities and retail electric service under" S.B. 3, USF, and EERLF.[4] (Emphasis added.)

{¶ 29} The conclusion to be drawn from the foregoing is that DP & L's monetary gain that Constellation claims results from application of Section II.B. of the stipulation actually results from the application of the statutory requirements of R.C. 4928.34(A)(6), and not from any devious or underhanded obfuscation. Based on this conclusion, we find no error in the commission's approval of the provision of the stipulation about which Constellation complains.

{¶ 30} The second issue subsumed in Constellation's third claimed error involves the level of shopping credits established by the commission in the MDP extension case. A "shopping credit" is an incentive to consumers to obtain competitive retail electric (generation) service from a provider other than the incumbent EDU. It is a credit against, or a deduction from, the EDU's bill for electric service.

{¶ 31} Intervening appellee DP & L urges this court to decline to consider the issue of shopping-credit level because the issue was not properly raised by Constellation. Indeed, Constellation did not assert in its application for rehearing or notice of appeal that the level of shopping credits established by the commission in the MDP extension case was unreasonable and unlawful.

{¶ 32} Yet all of the parties to this appeal, including DP & L, have addressed the issue of the proper level of shopping credits. Therefore, we assume for the sake of argument that the issue is properly before the court for our consideration.

{¶ 33} Constellation contends that absent a finding by the commission based "upon evidence in the record that DP & L was entitled to more stranded cost or

4. USF is the Universal Service Fund established under R.C. 4928.51 for funding low-income customer assistance programs, and EERLF is the Energy Efficiency Revolving Loan Fund established under R.C. 4928.61 for funding the energy-efficiency revolving-loan program established under R.C. 4928.62.

regulatory asset relief," the only lawful level of shopping credits is an amount equal to the sum of charges for generation service plus the transition charges (RTC and CTC).

{¶ 34} We find no statutory or other legal requirement that the shopping credits be set at the level suggested by Constellation. Rather, we agree with the commission that "[n]o particular level of shopping credits is mandated by statute—that is a discretionary matter for the Commission." Shopping credits are incentives established to promote customer's switching providers and effective competition. See R.C. 4928.37 and 4928.40. Whether shopping incentives or credits will promote competition is an issue of fact for the commission to determine. The commission found that both residential- and nonresidential-customer shopping credits set forth in the stipulation (the latter as modified) were reasonable and sufficient to encourage development of effective competition in retail electric-generation supply.

{¶ 35} The conclusion to be drawn from the foregoing discussion of shopping credits is that even if the issue were properly before the court, we would find no error in the commission's determination.

### Fourth Claimed Error

{¶ 36} Constellation complains about the commission's finding that the rate stabilization surcharge ("RSS") provided for in the stipulation should be applied to all electric-generation customers, whether or not they purchase their generation service from DP & L. The RSS is a mechanism by which the frozen rates can be adjusted during the three-year period (2006 through 2008) following the end of the MDP. The RSS would be added to the stabilized base rate for generation service and would reflect such items as increased fuel cost, purchased power, environmental costs, and the like. The RSS does not go into effect until the MDP has ended, and it is not automatic; it must be applied for and supported by DP & L and approved by the commission in *future* proceedings.

{¶ 37} For these reasons, the commission argues that Constellation's appeal of issues relating to the RSS are not ripe for appeal, citing *Ohio Edison Co. v. Pub. Util. Comm.* (1992), 63 Ohio St.3d 555, 589 N.E.2d 1292. Intervening appellee IEU joins the commission in its argument that Constellation's appeal of RSS issues is premature and should not be considered by the court. Constellation counters by stating that the issue on appeal is not whether certain RSS charges exist or their amount, but whether it is fair and reasonable to apply the RSS to all electric-generation customers. Constellation argues that the commission decided that issue in the affirmative and, thus, the issue is ripe for appeal.

{¶ 38} For purposes of this opinion, we consider the RSS issues raised by Constellation to be ripe for appeal.

{¶ 39} The commission specifically found: "[A]n RSS is reasonable and legally sustainable * * *. As to the issue of whether the RSS should apply to all customers, whether or not they purchase their generation from DP & L, the Commission would note, initially, that representatives of all customer groups agreed, in the stipulation, with charging the RSS to all customers. In addition, the Commission finds it is reasonable for DP & L to argue that it will incur costs in its position as the provider of last resort ['POLR'], which costs would not be recoverable other than through the RSS. While the Commission is not finding that the costs specified in the stipulation as the basis for the RSS are POLR[5] costs, the Commission does find that the existence of POLR costs makes it reasonable to apply the RSS to all customers."

{¶ 40} Constellation disputes both of the justifications the commission gave for approving the RSS mechanism. However, Constellation's arguments lack substance and are unconvincing. The record supports the commission; it does not support Constellation. Thus, we find no error in the commission's findings as to the RSS mechanism.

### Fifth Claimed Error

{¶ 41} In its final claimed error, Constellation attacks the commission's approval of the stipulation based on the second criterion for testing reasonableness, claiming that the settlement, as a package, does not benefit ratepayers and the public interest. Constellation claims that the commission gave only two reasons for finding that the second reasonableness criterion was met.

{¶ 42} First, Constellation disagrees with the commission's conclusion that the stipulation benefits the public interest by providing a two-year extension of the MDP and increased shopping credits. Constellation argues that extension of the MDP "does not in and of itself benefit the public interest." Rather, argues Constellation, only "the extension of a market development period coupled with establishing an appropriate shopping credit could meet the test." While acknowledging that the stipulation did increase the shopping credit, Constellation argues that "it did not increase the Commission approved shopping credit high enough to make the Stipulation reasonable and lawful" and that "[t]he Commission should have increased the shopping credit to [the level Constellation claimed to be proper in its third claimed error] at a minimum in order to have promoted competition, one of the policy goals of this State."

{¶ 43} Thus, Constellation is merely renewing its arguments concerning the level of shopping credits by putting those arguments in the context of a different

---

5. POLR costs are those costs incurred by DP & L for risks associated with its legal obligation as the default provider, or electricity provider, of last resort, for customers who shop and then return to DP & L for generation service.

complaint about the stipulation. We will not repeat our discussion of shopping credits here.

{¶ 44} Constellation identifies "[t]he second 'benefit' relied upon by the Commission [as] the existence of the rate stabilization plan ('RSP')." Constellation criticizes the commission for its alleged failure "to analyze and take into account the unlawful and unreasonable aspects of the RSP." Constellation argues that the RSP "unlawfully circumvents Section 4928.14(B), Revised Code, by adopting an alternative to the statutorily mandated competitive bid-out before the rules on competitive bid-out were adopted."

{¶ 45} The commission refutes Constellation's argument as follows:

{¶ 46} "Constellation's assertions notwithstanding, the Stipulation also complies with the language of R.C. 4928.14(B): 'The commission may determine at any time that a competitive bidding process is not required, if other means to accomplish *generally* the same option for customers readily available in the market and a reasonable means for customer participation is developed.' " (Emphasis added by the commission.)

{¶ 47} The commission then convincingly explained how the stipulation satisfies the alternatives to the competitive-bidding requirement of R.C. 4928.14(B), as follows:

{¶ 48} "The Stipulation satisfies the competitive bidding requirements of Section 4928.14(B) for the following reasons: (1) Stipulation § IX.F. provides for ongoing Commission review of market-based rates, through a competitive bidding process, if necessary; (2) Stipulation § IX.F. also provides that, if market-based rates do not reasonably reflect the rates established by the Stipulation, then the Commission may terminate the RSP and trigger a competitive bidding process; and (3) the Voluntary Enrollment Procedure provides DP & L customers the opportunity to choose any certified competitive retail supplier, thus providing customers with an option to select a marketer and a reasonable method to participate."

{¶ 49} The commission's finding that the stipulation, as a package, benefits ratepayers and the public was fully supported by the record and was reasonable and lawful. Therefore, we reject Constellation's fifth claim of error.

## Standard of Review

{¶ 50} R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable. Under this statutory standard, this court will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the PUCO's determination is not manifestly against the weight of the evidence and is not so

clearly unsupported by the record that it shows misapprehension, mistake, or willful disregard of duty. *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371. This court has consistently refused to substitute its judgment for that of the commission on evidentiary matters. See, e.g., *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 765 N.E.2d 862. As the court noted in *AK Steel* (a case that addressed an appeal from the commission's approval of a stipulated transition plan of a different EDU), the appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id. at 86, 765 N.E.2d 862. This burden is difficult to sustain, since the court has consistently deferred to the commission's judgment in matters that require the commission to apply its special expertise and discretion with regard to factual matters. *Cincinnati Bell Tel. Co. v. Pub. Util. Comm.* (2001), 92 Ohio St.3d 177, 180, 749 N.E.2d 262; *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288; *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1976), 46 Ohio St.2d 105, 108, 75 O.O.2d 172, 346 N.E.2d 778.

{¶ 51} "Due deference should be given to statutory interpretations by an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility." *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 17–18, 734 N.E.2d 775, citing *Collinsworth v. W. Elec. Co.* (1992), 63 Ohio St.3d 268, 272, 586 N.E.2d 1071.

{¶ 52} To the extent that Constellation's five claimed errors are directed at factual determinations of the commission, Constellation has failed to show that the record lacked probative evidence so as to show misapprehension, mistake, or willful disregard of duty on the part of the commission, or that the commission's determinations were against the manifest weight of the evidence. To the extent that Constellation's claims of error are directed at the commission's expertise, Constellation has failed to convince this court that it should substitute its judgment for that of the commission.

## Conclusion

{¶ 53} Based on the foregoing, we conclude that the decisions of the commission were reasonable and lawful, and we therefore affirm the orders of the commission.

Orders affirmed.

RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

Vorys, Sater, Seymour & Pease, L.L.P., W. Jonathan Airey and M. Howard Petricoff, for appellant.

Jim Petro, Attorney General, Duane W. Luckey, William L. Wright, and Thomas G. Lindgren, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Faruki, Ireland & Cox, P.L.L., Charles J. Faruki, Jeffrey S. Sharkey, and Paul L. Horstman, for intervening appellee Dayton Power & Light Company.

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, Daniel J. Neilsen, and Lisa G. McAlister, for intervening appellee Industrial Energy Users–Ohio.

Paul A. Colbert, John J. Finnigan Jr., and Kelley A. Karn, for intervening appellee Cincinnati Gas & Electric Company.