John B. Juhasz, for respondent.

OHIO CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Ohio Consumers' Counsel v. Pub. Util. Comm.,* 114 Ohio St.3d 340, 2007-Ohio-4276.]

(No. 2006–0788—Submitted April 17, 2007—Decided September 5, 2007.)

O'DONNELL, J.

{¶ 1} This is an appeal as of right by appellant, Ohio Consumers' Counsel ("OCC"), from an order of the Public Utilities Commission of Ohio ("commission" or "PUCO") in PUCO No. 05–276–EL–AIR. The commission's order approved a stipulation signed by intervening appellee Dayton Power & Light Company ("DP&L"), Cargill, Inc., Honda of America Mfg., Inc., and intervening appellee Industrial Energy Users–Ohio.

### Background

{¶ 2} The backdrop for this appeal is Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962 ("SB 3"), effective October 5, 1999, which provided for restructuring Ohio's electric-utility industry to achieve retail competition with respect to the generation component of electric service. SB 3 provided for a transition period, termed the "market-development period," during which an electric utility's rates would be subject to certain regulatory requirements.

{¶ 3} As a result of the failure of competition to develop according to expectations, DP&L filed an application in 2002 to extend its market-development period from December 31, 2003, through December 31, 2005. In September 2003, the commission approved a stipulation providing for the extension of DP&L's market-development period ("MDP-extension stipulation"). In addition to extending the market-development period, the commission approved a three-year "rate-stabilization period," to begin immediately following the end of the market-development period and ending on December 31, 2008. *In re Continuation of*

*Rate Freeze & Extension of Market Dev. Period for Dayton Power & Light Co.* (Sept. 2, 2003), PUCO No. 02–2779–EL–ATA, 2003 WL 22142843 (the "MDP-extension case") at 13, 19, 25.[1]

{¶ 4} The order in the MDP-extension case also permitted DP&L to collect, upon commission approval, a rate-stabilization surcharge of up to 11 percent of DP&L's tariffed generation rates as of January 1, 2004. Id. at 28. The rate-stabilization surcharge was intended to allow DP&L to recover generation-related cost increases for fuel, for environmental- and tax-law compliance, and for physical security and cyber security at plants owned by DP&L and its affiliates. Id. at 27. The rate-stabilization surcharge was to be assessed on all customers in DP&L's service territory, whether those customers purchased generation service from DP&L or another supplier. Id. at 28. With respect to those customers not taking generation service from DP&L, the rate-stabilization surcharge would act as a mechanism for the recovery of "provider-of-last-resort" ("POLR") costs.[2] Id. The MDP-extension stipulation provided that DP&L would seek approval of any rate-stabilization surcharge through an application filed pursuant to R.C. 4909.18. In *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, we upheld the commission's approval of the MDP-extension stipulation.

{¶ 5} Pursuant to the order approving the MDP extension, DP&L initiated this case by filing an application to increase rates through the implementation of the rate-stabilization surcharge. Several parties intervened in the case before the commission, including OCC, Cargill, Inc., Honda of America Mfg., Inc., and Industrial Energy Users–Ohio.

{¶ 6} After an investigation, the commission's staff filed a written report regarding DP&L's requested rate increase. DP&L, OCC, Cargill, Honda, and Industrial Energy Users–Ohio each filed objections to the staff report. A public hearing was held in Dayton on October 27, 2005.

{¶ 7} On November 3, 2005, DP&L, Cargill, Honda, and Industrial Energy Users–Ohio filed a stipulation with the commission that, if accepted, would resolve all outstanding issues. Evidentiary hearings were held, and testimony was presented regarding DP&L's rate-stabilization-surcharge application, the staff report, and the stipulation.

---

1. The commission's order and the parties in this case refer to the MDP-extension case as the RSP ("rate-stabilization period") case, and the MDP-extension stipulation as the RSP stipulation.

2. POLR costs represent charges incurred by an incumbent electric-distribution utility for risks associated with its statutory obligation under R.C. 4928.14(C) as the default provider, or provider of last resort, for customers who opt for another provider who then fails to provide service. See *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, at ¶ 24.

{¶ 8} On December 28, 2005, the commission issued its order approving the stipulation after making certain modifications. Among other things, the order extended DP&L's rate-stabilization period from the end of 2008 through December 31, 2010. The commission authorized the implementation of an unavoidable rate-stabilization surcharge rider amounting to 11 percent of DP&L's tariffed generation rates as of January 1, 2004. The commission also approved an environmental-investment rider, which was intended to allow DP&L to recover "environmental plant investments and incremental operations and maintenance, depreciation, and tax costs." The environmental-investment rider was set at 5.4 percent of DP&L's 2004 tariffed generation rates and would increase by 5.4 percent of DP&L's 2004 tariffed generation rates each year of the rate-stabilization period. Contrary to the terms proposed in the stipulation, the commission required that the entire environmental investment rider be avoidable by customers who shop during the rate-stabilization period. Finally, the commission approved a stipulation provision allowing DP&L to collect the rate-stabilization surcharge through its distribution-service tariffs.[3]

{¶ 9} OCC filed an application for rehearing, which was denied on February 22, 2006. OCC's appeal as of right is now before this court.

## Collateral Estoppel

{¶ 10} OCC contends that the doctrine of collateral estoppel bars relitigation of the issues in the MDP-extension case. OCC asserts that the commission cannot approve the stipulation in this case because it alters the stipulation that was approved in the MDP-extension case, without the permission of the signatories to the first stipulation. We do not agree that the commission's decision amounted to a relitigation of previously determined issues and that the commission cannot change or modify earlier orders.

{¶ 11} The doctrine of collateral estoppel operates to "preclude the relitigation of a point of law or fact that was at issue in a former action between the same parties and was passed upon by a court of competent jurisdiction." *Consumers' Counsel v. Pub. Util. Comm.* (1985), 16 Ohio St.3d 9, 10, 16 OBR 361, 475 N.E.2d 782. Collateral estoppel has been applied to commission proceedings. Id.

{¶ 12} The doctrine is inapplicable here because there was no relitigation in this matter of a point of law or finding of fact that was passed upon by the commission in the MDP-extension case. The MDP-extension case approved,

---

3. The stipulation used the term rate-stabilization charge for the rate-stabilization surcharge. The rate-stabilization surcharge referred to in the MDP-extension case now consists of the rate-stabilization charge and the environmental-investment rider. The unavoidable rate-stabilization surcharge/rate-stabilization charge represents the 11 percent increase of DP&L's tariffed generation rate as of January 1, 2004.

among other things, a rate-stabilization surcharge of up to 11 percent of DP&L's tariffed generation charges as of January 1, 2004. The rate-stabilization surcharge was intended to allow DP&L to recover generation-related costs from increases in fuel prices, actions taken to comply with environmental and tax laws and physical and cyber security. The rate-stabilization surcharge was to be imposed in a rider on all customers, whether those customers purchased their generation from DP&L or from another supplier. Finally, the surcharge was to be assessed only upon the commission's approval after DP&L verified those increases in a subsequent application pursuant to R.C. 4909.18.

{¶ 13} This case, in contrast, concerns the amount DP&L may charge through that rate-stabilization-surcharge rider. In the MDP-extension case, the commission approved the procedure that DP&L needed to follow before it could collect a rate-stabilization surcharge and permitted DP&L to recover certain increases in generation-related costs, subject to PUCO approval. And in this case, the commission determined that the rates that DP&L set in the rate-stabilization-surcharge rider were reasonable and supported by the record, and it approved the surcharge. Thus, collateral estoppel is not applicable.

{¶ 14} OCC's argument that the commission erred in changing certain provisions of its previous order is without merit. The commission may change or modify earlier orders as long as it justifies any changes. *Consumers' Counsel v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 49, 50–51, 10 OBR 312, 461 N.E.2d 303. The commission found that several important projections relied on by the MDP-extension stipulation had not in fact materialized and that that circumstance justified some modifications to its earlier order. The commission found that the competitive market in DP&L's service territory had not developed as the commission had expected when it approved the MDP-extension stipulation. According to testimony at the hearing, only 0.03 percent of DP&L's total load (representing seven small-business customers) had switched to a retail electric service provider not affiliated with DP&L. The commission further noted that four rounds of competitive bidding were conducted in 2005 and that none of the rounds had produced a single bidder. Finally, the commission found that the record demonstrated that fuel and environmental costs vastly exceeded the commission's expectations at the time that the MDP-extension stipulation was approved.

{¶ 15} As a result, the commission determined that the stipulation in this case would benefit ratepayers and the public interest by protecting DP&L's standard-service customers from price volatility and rate shock. The commission found that there was significant value in extending the rate-stabilization period for an additional two years to avoid unpredictable market rates in 2009 and 2010. The commission further found that the stipulation provided financial stability to

DP&L by allowing it to recover its environmental-compliance costs, which exceed those anticipated at the time of the MDP-extension stipulation. Finally, the commission modified the stipulation by making the environmental-investment rider avoidable for the duration of the rate-stabilization period to better promote the development of competitive markets. In sum, the record supports the changes, and the commission explained its reasons for modifying its earlier order approving the MDP-extension stipulation. See *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 110 Ohio St.3d 394, 2006-Ohio-4706, 853 N.E.2d 1153, at ¶ 25.

{¶ 16} In light of the commission's authority to modify previous orders, the agreement of all signatories to the MDP-extension stipulation was not required. While the commission encourages agreement on issues, it is not bound to accept the terms of any stipulation. See *Akron v. Pub. Util. Comm.* (1978), 55 Ohio St.2d 155, 157, 9 O.O.3d 122, 378 N.E.2d 480. A stipulation presented to the commission is entitled to the force of law only if it is approved by an order of the commission. See, generally, *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 82–83, 765 N.E.2d 862; Ohio Adm.Code 4901–1–30(D). As explained above, the commission may change or modify earlier orders as long as it justifies any changes. Contrary to OCC's assertion, the MDP-extension stipulation was not modified unilaterally by DP&L or Industrial Energy Users–Ohio, the only two parties who signed both the MDP-extension stipulation and the stipulation at issue in this appeal. Rather, the commission modified its earlier order in the MDP-extension case and sufficiently justified those changes. We therefore affirm the PUCO's determinations on these issues.

### Generation–Service Tariffs versus Distribution–Service Tariffs

{¶ 17} OCC maintains that the commission erred when it approved a distribution-service rate increase to compensate DP&L for costs that are purely generation-service costs. The commission's approval of the rate and amount is in conformity with applicable law. However, the commission erred in allowing DP&L to recover generation costs through distribution-service tariffs.

{¶ 18} In the MDP-extension stipulation in 2003, DP&L proposed a rate-stabilization surcharge, which was intended to allow DP&L to increase rates in order to recover increases in generation-related costs for fuel, for actions taken in compliance with environmental and tax laws and for physical security and cyber security. These increased costs were to be collected from all customers, whether they purchased generation service from DP&L or from another supplier. With respect to those customers who do not take generation service from DP&L, the rate-stabilization surcharge would compensate DP&L for the risks and costs that DP&L will incur as a POLR. See R.C. 4928.14(C).

{¶ 19} In this case, the commission approved a provision of the stipulation that allowed DP&L to place the rate-stabilization-surcharge rider in the company's

distribution-service tariffs. Objections were made to the commission that the rate-stabilization surcharge is a generation charge that should not be placed in the distribution-service tariffs. The commission rejected these arguments and found that it was reasonable to place the rate-stabilization surcharge in the distribution-service tariffs because, like distribution rates, the surcharge would be charged to all customers in DP&L's service territory. According to the commission, this result would reduce confusion as to whether the rate-stabilization surcharge was avoidable by customers who were not receiving generation service from DP&L.

{¶ 20} OCC claims that placement of the rate-stabilization surcharge in a distribution-service-tariff rider for collection violates the clear intent of Ohio's electric-industry-restructuring legislation. OCC argues that it is contrary to Ohio law and policy that five years into electric-industry restructuring, the commission is essentially rebundling generation and distribution components.

{¶ 21} The commission's decision in this case did not address whether the placement of generation-related charges in distribution-service-tariff riders violates the provisions of SB 3. The commission merely adopted the finding of the staff report that because the rate-stabilization surcharge is unavoidable, its placement in the distribution-service tariffs was reasonable. However, a commission staff witness testified that the parties who have objected to the placement of the rate-stabilization surcharge in distribution-service-tariff riders were "technically correct." This witness further testified that "[w]hile staff is indifferent as to the placement of the [rate-stabilization surcharge] Rider, it is clearly generation-related and, in theory, belongs in the Generation tariffs."

{¶ 22} The cornerstone of SB 3 was the requirement that electric utilities unbundle the three major components of electric service—generation, distribution, and transmission. See R.C. 4928.31(A)(1) and 4928.34(A)(1) through (7). Before generation-service competition began under SB 3, customers received and paid for the three major components of electric service on a bundled basis. That is, the three components were priced as one, and electric utilities used the revenues from the bundled electric services to support their generation, transmission, and distribution expenses and investments. With the advent of customer choice of electric-generation service under SB 3, "it became necessary for electric utilities to unbundle the three service components and their own components, so that customers could evaluate offers from competitive generators." See *Migden–Ostrander v. Pub. Util. Comm.*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, at ¶ 3–4.

{¶ 23} The PUCO acknowledges that SB 3 required that rates be separated into separate generation-, transmission-, and distribution-service components. The PUCO also concedes that there is an ongoing requirement under SB 3 that

competitive retail electric services be unbundled, i.e., priced separately, to aid customers in comparison shopping. See R.C. 4928.07.

{¶ 24} However, the PUCO contends that SB 3 was not violated in this instance, because this case does not involve a competitive service. The rate-stabilization-surcharge rider is intended, in part, to pay DP&L for costs associated with its POLR obligations. The PUCO maintains that the POLR obligation is a distribution-service function because only an electric-distribution utility, such as DP&L, can provide this service. It is unclear why the generation costs should not be placed into the generation-service tariffs.

{¶ 25} The commission itself amended the stipulation in this case so that a portion of DP&L's POLR costs are avoidable by shopping customers. As originally contemplated in the MDP-extension case, DP&L would collect POLR costs—including fuel and generation-related environmental cost increases—through the rate-stabilization surcharge. In the stipulation in this case, DP&L split the rate-stabilization *surcharge* into two separate components: (1) a rate-stabilization *charge* to recover fuel costs and (2) an environmental-investment rider to recover environmental costs. The commission required that the entire environmental-investment rider be avoidable by customers who purchase generation service from a provider other than DP&L.

{¶ 26} We find that the evidence supports including actual generation costs in the generation-service tariffs. The commission's own expert on staff testified that it is technically appropriate under SB 3 to put the rate-stabilization charge in the generation-service tariffs. We share OCC's concern that once the industry moves past the rate-stabilization phase, the distinction between generation and distribution in the tariffs and rate structures will be too blurred to effectively apply SB 3. Likewise, counsel for the commission represented at oral argument that including the charge in distribution-service tariffs instead of in generation-service tariffs was essentially a distinction without a difference, meaning that the appropriate generation charges could be recorded in the generation tariffs without a problem. Accordingly, the PUCO's order is affirmed with regard to the amount of the charge but is reversed with regard to the placement of the charge in the distribution-service tariffs. We remand the matter to the commission to order DP&L to place the appropriate generation charges in the generation-service tariffs. We point out that while we have affirmed the commission's order with regard to the POLR costs in this and previous cases, the commission should carefully consider what costs it is attributing as costs incurred as part of an electric-distribution utility's POLR obligations.

## Public Interest

{¶ 27} We deny OCC's claim that the commission approved a settlement that does not benefit ratepayers and the public interest. OCC contends that the

commission ignored evidence regarding the unfavorable rate impact the stipulation would have on residential customers in comparison to the provisions found in the stipulation approved in the MDP-extension case.

{¶ 28} The commission did not ignore the evidence offered by OCC; the commission rejected it. The commission found that the projected market rates offered by the OCC witness were unreliable. The commission determined that price stability was of higher value in a developing market. Specifically, the commission concluded that "the value of extending stable, predictable rates through 2010 is a significant benefit to ratepayers and the public interest and that such value outweighs the burden of the increased rates."

{¶ 29} In light of the commission's consideration of the evidence, it appears that OCC is asking this court to reweigh the evidence and substitute its judgment for that of the commission. OCC has not shown that the commission's findings here are manifestly against the weight of the evidence, and this court will not second-guess the commission on questions of fact absent such a showing. See *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.* (1999), 86 Ohio St.3d 53, 58, 711 N.E.2d 670; *Cincinnati v. Pub. Util. Comm.* (1993), 67 Ohio St.3d 523, 528–529, 620 N.E.2d 826. We therefore affirm the PUCO's determinations on this issue.

## Side Agreements

{¶ 30} OCC argues that the stipulation is unlawful because DP&L enticed Cargill and Honda to sign the stipulation by offering them, in a side agreement, better terms than the stipulation provides to other customers in the same situation. We do not agree. Specifically, OCC's claim revolves around two "side agreements" whereby DP&L offered to waive a tariff provision for Honda and Cargill that required 60 days' notice to return to DP&L's standard service. Under these agreements, Honda and Cargill could return to DP&L for generation service with 30 days' notice. According to OCC, these agreements amount to discriminatory and preferential treatment of Cargill and Honda.

{¶ 31} However, a DP&L witness testified before the commission that DP&L would extend this offer to any similarly situated customer. Thus, OCC's claim that the waiver was applied in a discriminatory manner is not supported by the record. In addition, contrary to OCC's assertion, the waiver does not appear to be anticompetitive, because a shorter notice period gives customers more time to shop for another generation provider. Moreover, OCC cannot show harm to residential customers, because evidence before the commission indicated that no residential customer in DP&L's service territory had switched to a competitive generation provider unaffiliated with DP&L. Thus, there would be no reason for residential customers to ask for a shorter notice period to return to DP&L for generation service.

{¶ 32} OCC also argues that the commission erred when it denied its motion to admit the side agreements into evidence. Despite the commission's conclusion that the side agreements were not relevant, it is clear from the record that the commission did review the side agreements. In fact, the commission allowed OCC to question a DP&L witness on the nature and intent of the side agreements. Thus, the commission's exclusion of this evidence did not prejudice OCC. See, e.g., *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 384, 2006-Ohio-5853, 856 N.E.2d 940, at ¶ 22 (denial of motion to intervene did not prejudice OCC when commission took OCC's filings into consideration). Accordingly, OCC's arguments relating to side agreements and discriminatory behavior are not well taken.

### Voluntary–Enrollment Procedure

{¶ 33} The commission's decision on the voluntary-enrollment procedure was not unlawful, unreasonable, or against the manifest weight of the evidence.

{¶ 34} The voluntary-enrollment procedure was set out in the MDP-extension stipulation as one part of the proposed alternative to the competitive-bidding requirement of R.C. 4928.14(B). In addition to the voluntary-enrollment procedure, DP&L's proposed alternative to competitive bidding (1) established a market-based standard-service offer with price monitoring by the commission to ensure that rates would remain market-based over time and (2) allowed the commission to end the rate-stabilization period if the market rates do not reflect the rates established in the stipulation. In *Constellation NewEnergy*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 44–49, we held that these provisions complied with R.C. 4928.14(B).

{¶ 35} OCC argued that the voluntary-enrollment procedure should be extended beyond the commission-approved extension through 2007 to cover the remaining years of the rate-stabilization period.

{¶ 36} The commission has the authority, under R.C. 4928.14(B), to "determine at any time that a competitive bidding process is not required, if other means to accomplish generally the same option for customers is readily available in the market and a reasonable means for customer participation is developed." In this case, the commission required that the voluntary-enrollment procedure be conducted in 2006 and 2007 in the same manner as in 2005. The alternative-to-bidding provisions of the MDP-extension stipulation—commission price monitoring of the market-based standard-service offer and ending the rate-stabilization period if market rates are lower than stipulation rates—remain in effect under the stipulation approved by the PUCO in the instant case. The OCC's claim that the program would be more effective in the later stages of the rate-stabilization period is speculative. The commission noted in its order that in 2005, there were four rounds of competitive bidding conducted under the voluntary-enrollment

procedure and that none of the rounds of competitive bidding produced a single bidder. Finally, the commission made the environmental-investment rider avoidable for the duration of the rate-stabilization period for those who shop, in order to further promote competition.

{¶ 37} In sum, competitive bidding will be held after the market-development period, as R.C. 4928.14(B) requires. In addition, the commission-approved stipulation provided other means to accomplish generally the same option as a competitive bid (monitoring the standard-service offer to ensure that it is market based) and also provided a reasonable means of customer participation (conducting the voluntary-enrollment procedure in 2006 and 2007, and providing shopping incentives).

{¶ 38} OCC has not shown that the commission's decision regarding the voluntary-enrollment procedure was unlawful, unreasonable, or against the manifest weight of the evidence. We therefore affirm the commission's determination.

### Three–Part Test for Settlements

{¶ 39} OCC urges this court to revisit *Consumers' Counsel v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 123, 592 N.E.2d 1370, which endorsed the commission's use of the three-part reasonableness test for reviewing settlement stipulations. We decline to consider this argument due to OCC's failure to preserve the issue on appeal.

{¶ 40} OCC waived this issue by not setting it forth in its application for rehearing. R.C. 4903.10 provides that an application for rehearing "shall be in writing and shall set forth specifically the ground or grounds on which the applicant considers the order to be unreasonable or unlawful. No party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in the application." We have held that setting forth specific grounds for rehearing is a jurisdictional prerequisite for review. *Consumers' Counsel v. Pub. Util. Comm.* (1994), 70 Ohio St.3d 244, 247, 638 N.E.2d 550. OCC also failed to set forth this specific issue in its notice of appeal to this court, and this failure precludes our considering the issue. R.C. 4903.13; *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, at ¶ 21. Therefore, OCC's argument is rejected.

### Conclusion

{¶ 41} R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds that the order is unlawful or unreasonable. For the reasons explained above, we hold that all but one of OCC's propositions of law fail to establish that the commission's order was unlawful or unreasonable. We remand the case to the commission to issue an order that DP&L adjust the location of appropriate

generation charges from distribution-service tariffs to generation-service tariffs. Finally, as we continue to see the rate-stabilization plans appealed from the commission, we presume that the commission is sharing its evaluations and reports on the effectiveness of competition with the legislature, as mandated by R.C. 4928.06(C), so that it can continue to evaluate the need for further legislative action.

Order affirmed in part
and reversed in part,
and cause remanded.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON, O'CONNOR, LANZINGER and CUPP, JJ., concur.

---

Janine L. Migden–Ostrander, Ohio Consumers' Counsel, and Jeffrey L. Small, Ann M. Hotz, Larry S. Sauer, and Joseph P. Serio, Assistant Consumers' Counsel, for appellant.

Marc Dann, Attorney General, and Duane W. Luckey, Werner Margard III, and Steven L. Beeler, Assistant Attorneys General, for appellee.

Faruki, Ireland & Cox, P.L.L., Charles J. Faruki, and Jeffrey S. Sharkey, for intervening appellee Dayton Power & Light Company.

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, Lisa G. McAlister, and Daniel J. Neilsen, for intervening appellee Industrial Energy Users–Ohio.