Industrial Energy Users-Ohio et al., Appellants, *v.* Public Utilities Commission of Ohio et al., Appellees.

[Cite as *Indus. Energy Users–Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990.]

(No. 2006–1594—Submitted October 9, 2007—Decided March 13, 2008.)

O'Donnell, J.

{¶ 1} The Industrial Energy Users–Ohio ("IEU"), FirstEnergy Solutions Corporation, the Office of the Ohio Consumers' Counsel ("OCC"), and Ohio Energy Group appeal as of right from orders of the Public Utilities Commission of Ohio approving the application of Columbus Southern Power Company and Ohio Power Company (collectively, "AEP") to build an electric-generating facility in Meigs County, Ohio. Specifically, the commission's approval allows AEP to collect approximately $24 million for research and development of the generating facility from its customers and further contemplates that AEP will be permitted to recover the construction and maintenance costs of the facility from its distribution customers upon completion.

{¶ 2} Appellants contend that because Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962 ("S.B. 3"), separated electric generation, which is an unregulated competitive service, from electric distribution, which is a regulated noncompetitive service, the commission's order permitting AEP, an electric-distribution utility, to build a generation plant should be reversed.

{¶ 3} AEP contends, however, that because R.C. 4928.14 permits an electric-distribution utility to be involved in building an electric-generating facility to satisfy the utility's provider-of-last-resort ("POLR") and standard-service-offer obligations, it therefore may recover the cost of designing and constructing such a facility from its distribution customers.

{¶ 4} We agree that provisions of S.B. 3 prevent an electric-distribution utility from using revenues from noncompetitive distribution service to subsidize the cost of providing a competitive generation-service component; however, there may be merit to the commission's regulation of the design, construction, and operation of the proposed generation facility as a distribution-ancillary service related to AEP's POLR obligation, but this record is not fully developed in that

regard. Accordingly, we remand this matter to the commission for further findings. Because the matter is being remanded for further development of the record and because the commission has already issued a conditional refund order that remains in effect, we decline to rule at this time upon IEU's request for a refund of costs already collected from AEP's customers.

## HISTORY OF DEREGULATION

{¶ 5} S.B. 3 restructured Ohio's electric-utility industry to foster retail competition in the generation component of electric service. As we have repeatedly recognized, S.B. 3 altered the traditional rate-based regulation of electric utilities by requiring the three components of electric service—generation, transmission, and distribution—to be separated. See, e.g., *Migden–Ostrander v. Pub. Util. Comm.*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, ¶ 3–4.

{¶ 6} Pursuant to R.C. 4928.03 and 4928.05, electric generation is an unregulated, competitive retail electric service, while electric distribution remains a regulated, noncompetitive service pursuant to R.C. 4928.15(A). R.C. 4928.02(G) provides that it is the state's policy to "[e]nsure effective competition in the provision of retail electric service by avoiding anticompetitive subsidies flowing from a noncompetitive retail electric service to a competitive retail electric service or to a product or service other than retail electric service, and vice versa." This provision "prohibits public utilities from using revenues from competitive generation-service components to subsidize the cost of providing noncompetitive distribution service, or vice versa." *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 50. In the context of S.B. 3 electric-utility deregulation, each service component must stand on its own. Id., citing *Migden–Ostrander* at ¶ 4.

## AEP APPLICATION AND PROCEEDINGS

{¶ 7} On March 18, 2005, AEP filed an application with the commission for approval of a mechanism to recover the expected expenditures for the design, construction, and operation of a 629–megawatt integrated-gasification-combined-cycle ("IGCC") electric-generation facility in Meigs County, Ohio.

{¶ 8} On April 10, 2006, the commission issued its opinion and order approving the application. In its order, the commission determined that it had the authority to regulate the design, construction, and operation of the proposed generation facility because it was a distribution-ancillary service related to AEP's statutory POLR obligation. Accordingly, the commission's order permitted AEP to charge its customers an estimated $23.7 million to fund AEP's preliminary research for the proposed construction of the IGCC electric-generation facility.[1]

---

1. AEP argued that the IGCC process is a favored technology because it burns coal in an environmentally friendly manner. The IGCC process uses gas and steam turbines to generate

Additionally, the commission declared that it has the authority to approve a plan that would permit AEP to recover the construction and operation costs of the generating plant from distribution customers. In its application, AEP estimated that the cost of the project could reach $1.27 billion. However, at oral argument, the parties represented that the overall cost could exceed $2 billion.

{¶ 9} On June 28, 2006, the commission issued an entry, following a motion for a rehearing, in which it reiterated its authority to establish a charge related to the overall construction and operation of a generating plant as proposed in AEP's application. However, because the commission also determined that elements of the design and engineering might be transferable to other facilities in other states, it ordered AEP to be prepared to refund the charges collected from its customers for all transferable research if AEP has not commenced a continuous course of construction of the proposed IGCC plant by June 28, 2011.

{¶ 10} FirstEnergy Solutions, IEU, OCC, and the Ohio Energy Group all appealed the commission's order to this court, contending, inter alia, that the order was contrary to law because it improperly regulated competitive electric-generation service in violation of R.C. Chapter 4928 and it authorized an increase in electric-distribution rates without complying with the provisions of R.C. Chapter 4909. Further, Ohio Partners for Affordable Energy filed an amicus brief on behalf of the appellants. AEP intervened as an appellee, and the International Brotherhood of Electrical Workers Local 972, Ironworkers Local 787, Parkersburg–Marietta Building and Construction Trades Council, AFL–CIO, and Murray Energy Corporation filed amicus briefs on behalf of appellees.

{¶ 11} The issues presented to this court are whether the commission properly designated an unregulated competitive generation service as a regulated distribution-ancillary service in order to exercise regulatory jurisdiction, whether the commission properly determined that AEP's POLR obligation justifies a rate-based recovery to build and operate a generation facility, and whether the commission properly denied the requested refund of $24 million in generation-plant research-and-development costs that AEP has collected from its customers pursuant to the commission's order.

## STANDARD OF REVIEW

{¶ 12} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50.

electricity without releasing contaminants associated with traditional coal-burning plants. This process has the environmental benefits of a natural-gas-fired plant while using coal, a more readily available fuel source.

We will not reverse or modify a commission decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.,* 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id. We will not reverse a commission order absent a showing by the appellant that it has been or will be harmed or prejudiced by the order. *Myers v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 299, 302, 595 N.E.2d 873.

{¶ 13} Although we have "complete and independent power of review as to all questions of law" in appeals from the commission, *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922, we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

## DISTRIBUTION–ANCILLARY SERVICE

{¶ 14} IEU and the other appellants argue that the commission has approved an effort by AEP to ignore the current statutory process and to recover from its distribution customers the costs of planning, building, and maintaining a competitive generation facility. FirstEnergy Solutions points out that the commission acknowledged in its order that retail electric-generation service is competitive under R.C. 4928.03 and therefore it is not subject to commission regulation.

{¶ 15} The commission contends that its current order regulates only noncompetitive electric retail "ancillary services."

{¶ 16} R.C. 4928.01(A)(1) defines "ancillary service" as:

{¶ 17} "Any function necessary to the provision of electric transmission or distribution service to a retail customer and includes, but is not limited to, scheduling, system control, and dispatch services; reactive supply from generation resources and voltage control service; reactive supply from transmission resources service; regulation service; frequency response service; energy imbalance service; operating reserve-spinning reserve service; operation reserve-supplemental reserve service; load following; back-up supply service; real-power loss replacement service; dynamic scheduling; system black start capability; and network stability service."

{¶ 18} The commission found that most of the ancillary services enumerated in the statutory definition require a generating plant. Therefore, the commission concluded that S.B. 3 contemplates that an electric-distribution utility will provide ancillary service from a generating plant, making the recovery of costs associated with that generating plant a distribution-ancillary service subject to the commission's regulation.

{¶ 19} Appellants dispute the commission's analysis, asserting that the construction and maintenance of an electric-generating facility is fundamental to the generation of electric service. The Ohio Energy Group opposes the commission's determination that it is able to regulate the proposed electric-generating facility by classifying the service as a regulated distribution-ancillary service rather than what it really is—a competitive electric-generation service. The Ohio Energy Group further contends that the commission is permitting AEP to recover and earn a return on its investment in a power plant, which was previously guaranteed by regulating the electric utility prior to deregulation. It notes that, since the enactment of S.B. 3, utilities no longer have any guarantee that they will either recover costs or earn a return on their power-plant investments through cost-based rates. OCC contends that the commission's findings move the state closer to re-regulation and that, left undisturbed, the commission's exercise of jurisdiction over generation, under the guise of distribution-ancillary services, could circumvent R.C. Chapter 4928 by permitting the commission to exercise jurisdiction over all generation functions.

{¶ 20} It is well settled that the generation component of electric service is not subject to commission regulation. In *Constellation NewEnergy, Inc.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 2, we stated that S.B. 3 "provided for restructuring Ohio's electric-utility industry to achieve retail competition with respect to the generation component of electric service." R.C. 4928.03 specifies that retail electric-generation service is competitive and therefore not subject to commission regulation, and R.C. 4928.05 expressly removes competitive retail electric services from commission regulation. Moreover, R.C. 4928.14(A) requires an electric-distribution utility to provide a market-based standard service offer of all competitive retail electric services, including electric-generation service.

{¶ 21} Thus, the issue presented here is whether the commission properly identified the subject matter of AEP's application as a distribution-ancillary service subject to its regulatory jurisdiction.

{¶ 22} The statutory definition of ancillary service, set forth in R.C. 4928.01(A)(1), contains examples of services that involve the control and regulation of the flow of electricity, not the planning and construction of generation facilities. Because R.C. 4928.03 explicitly declares electric generation to be a

competitive retail electric service and R.C. 4928.05 expressly provides that electric generation is no longer subject to the commission's regulation, the classification of AEP's proposed electric-generation facility as a distribution-ancillary service is contrary to law.

{¶ 23} The commission's holding blurs the legislative distinctions between electric transmission, generation, and distribution. Adoption of its rationale may result in these three functions all being subject to commission regulation, which would negate the legislature's deregulation of the electric-utility industry. While we appreciate the commission's concern with respect to the future reliability of the electric-generation market as Ohio's market-development period comes to an end, a laudable and practical concern for all Ohio utility consumers, we have previously stated that a concern for the future of the competitive market does not empower the commission to create remedies beyond the parameters of the law. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 109 Ohio St.3d 328, 2006-Ohio-2110, 847 N.E.2d 1184, ¶ 38. The existing legislation sufficiently segregates generation of electricity from distribution, and in order to permit the commission to regulate generation services, additional legislative authority is necessary.

{¶ 24} Accordingly, we reverse the commission's finding, which approved, as a distribution-ancillary service, AEP's application.

## POLR—STANDARD–SERVICE OFFER

{¶ 25} The commission further found that, as an electric distributor, AEP has a duty under R.C. 4928.14 to provide retail electric service to consumers as a POLR, and that this duty provides additional justification for rate-based recovery to build and operate a generation facility.[2] AEP contends that our decision in *Constellation NewEnergy, Inc.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 39–40, supports its position that it is permitted to recover costs associated with fulfilling its POLR responsibility. While the statute imposes a duty on an electric-distribution utility to become a POLR, it fails to specify the manner in which such a distribution utility is to ensure the availability of energy. In this regard, AEP contends that the commission may authorize the recovery of its

---

2. R.C. 4928.14 speaks of an electric-distribution utility providing competitive retail electric-generation service through a "standard service offer." Ohio Adm.Code 4901:1–35–03, Appendix A, defines "standard service offer" as "the provision of a market-based variable-rate firm generation service offered by the [electric-distribution utility] as the provider of last resort" and further defines "POLR" as "the statutory responsibility of the [electric-distribution utility] to provide electric supply service to its customers on a comparable and nondiscriminatory basis within its certified territory. This responsibility may be fulfilled by the [electric-distribution utility] providing standard service offer and by providing all other retail electric services necessary to maintain essential electric service to consumers."

costs from its distribution customers in order to fulfill its statutory POLR responsibility.

{¶ 26} FirstEnergy Solutions argues that AEP and the commission overextend the electric-distribution utility's POLR obligation and standard-service offerings. It acknowledges that R.C. 4928.14 requires AEP to provide generation service as a POLR, but it contends that there is a distinction between securing electric service from the competitive market and the planning, building, and maintaining of a facility to produce generation service. FirstEnergy Solutions points to the testimony of AEP's own witness, Bruce Braine, to demonstrate that a distribution utility is not required to build the plant that provides the electricity necessary to satisfy its POLR obligation. IEU and OCC argue that in order for the commission to approve AEP's application as a POLR charge, it needs to establish the rates in accordance with its traditional ratemaking authority.

{¶ 27} R.C. 4928.14 does require an electric-distribution utility to be prepared to provide retail electric service to consumers through a standard-service offer. Regardless of how the service is provided, the electric-distribution utility will incur noncompetitive costs associated with the fulfillment of its POLR obligation. We have previously stressed the importance of distinguishing between the regulated and unregulated costs associated with the POLR obligation, stating that "the commission should carefully consider what costs it is attributing as costs incurred as part of an electric-distribution utility's POLR obligations." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 26. Pursuant to R.C. 4928.15, all noncompetitive retail electric-distribution-service rates and charges shall be established in accordance with the procedures set forth in R.C. Chapters 4905 and 4909.

{¶ 28} R.C. Chapter 4905 governs the commission's general power to regulate public utilities, while R.C. Chapter 4909 governs the commission's power to set utility rates and charges.

{¶ 29} Notably, R.C. 4909.15 provides that any property sought to be included in the calculation of utility rates must be used and useful in rendering the public-utility service or it must be at least 75 percent complete. We have previously refused to include in a utility ratebase property that was not yet used and useful for service to consumers, noting, "Incorporated in this statutory language is the generally accepted principle that a utility is not entitled to include in the valuation of its rate base property not actually used or useful in providing its public service, no matter how useful the property may have been in the past or may yet be in the future." *Ohio Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 449, 453, 12 O.O.3d 378, 391 N.E.2d 311 (refusing to permit a nuclear plant that was still in the testing stages to be included in the valuation of

a public utility's ratebase because the plant was not useful or used in supplying service to ratepayers).

{¶ 30} We also have held that "[i]n order to meet the requirements of R.C. 4903.09, * * * the PUCO's order must show, in sufficient detail, the facts in the record upon which the order is based, and the reasoning followed by the PUCO in reaching its conclusion." *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 306, 312, 513 N.E.2d 337. Although strict compliance with the terms of R.C. 4903.09, which requires the commission to file a written opinion setting forth its reasons for its decision, is not required, " '[a] legion of cases establish that the commission abuses its discretion if it renders an opinion on an issue without record support.' " *Tongren v. Pub. Util. Comm.* (1999), 85 Ohio St.3d 87, 90, 706 N.E.2d 1255, quoting *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 163, 166, 666 N.E.2d 1372.

{¶ 31} While the commission may allow recovery of an electric-distribution utility's noncompetitive costs that are associated with its effort to secure competitive retail electric service in furtherance of its statutory POLR obligation, the commission's approval must be given in accordance with R.C. Chapters 4905 and 4909.

{¶ 32} The evidence does not support the order permitting AEP to recover the costs associated with the research and development of the proposed generation facility. To warrant its conclusions regarding AEP's POLR obligation, the commission may supplement the record with evidence to support its order and must verify that AEP has complied with the application requirements under R.C. 4909.18. Also, because AEP has not yet begun construction of the generation facility, compliance with the 75 percent used-and-useful standard should also be addressed.

{¶ 33} Additionally, we note that while the commission details potential problems with the fleet of existing generation facilities, it fails to make any findings regarding the amount of generation that AEP needs to guarantee its Ohio distribution responsibilities. Nor does the record demonstrate what portion of the facility's costs should be attributed to AEP's POLR obligation versus what costs should be recovered through competitive rates when the facility begins generating electricity.[3] Accordingly, the record before us is incomplete in these respects and the commission is instructed to make additional findings in support

---

3. The commission argued in its merit brief that a power plant can fill numerous roles "even after the *primary function* of those power plants *has been deregulated.*" (Emphasis added.) The commission admits the *primary purpose* of the plant is for the unregulated provision of electric generation. Yet the record presented to the court places the entire cost for planning, building, and maintaining the plant with the distribution customers in the category of noncompetitive service.

of its conclusions in this regard. We remand the case to the commission for further proceedings consistent with this opinion.

## RESEARCH–AND–DEVELOPMENT COSTS

{¶ 34} IEU and OCC seek an order to refund the $24 million in IGCC plant research-and-development costs that AEP has already recovered from its customers. IEU acknowledges this court's holding in *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.* (1957), 166 Ohio St. 254, 2 O.O.2d 85, 141 N.E.2d 465, paragraph two of the syllabus: "Where the charges collected by a public utility are based upon rates which have been established by an order of the Public Utilities Commission of Ohio, the fact that such order is subsequently found to be unreasonable or unlawful on appeal to the Supreme Court of Ohio, in the absence of a statute providing therefor, affords no right of action for restitution of the increase in charges collected during the pendency of the appeal."

{¶ 35} The commission argues that we should deny the request because IEU had an opportunity to request a stay of the commission's order but failed to do so, and it notes that it ordered AEP to refund all charges collected for expenditures that are transferable to other projects if AEP has not commenced a continuous course of construction of the plant within five years of its entry on rehearing.

{¶ 36} In view of our remand of this matter to the commission, we need not reach the matter of refund. Therefore, we decline to deviate from *Keco* to create an exception based on these facts.

## CONCLUSION

{¶ 37} The provisions of S.B. 3 prevent an electric-distribution utility from using noncompetitive distribution revenues to subsidize the cost of providing competitive generation-service components. However, on a properly supported record, the commission may, in accordance with R.C. Chapters 4905 and 4909, approve recovery of an electric-distribution utility's noncompetitive costs associated with its effort to secure competitive retail service in furtherance of its POLR obligation. Here, the record does not demonstrate the extent to which recovery should be permitted in this case or whether the appropriate statutory procedures for obtaining such recovery were followed. Accordingly, we remand this case to the commission for further proceedings consistent with this opinion. Because we remand this case to the commission, and because the commission's conditional refund order remains in effect, we need not reach the issue of a refund, and we decline to create an exception to our precedent of denying claims for refund from approved orders of the commission.

Order affirmed in part
and reversed in part,
and cause remanded.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., concurs separately.

---

**PFEIFER, J., concurring.**

{¶ 38} I concur fully in the opinion and the judgment. I write separately solely to state that I would be willing to order a refund without remanding that issue to the commission.

---

McNees Wallace & Nurick, L.L.C., Samuel C. Randazzo, Lisa G. McAlister, and Daniel J. Neilsen, for appellant Industrial Energy Users of Ohio.

Kathy J. Kolich, for appellant FirstEnergy Solutions Corporation.

Jeffrey L. Small, Kimberly Bojko, and Janine L. Migden–Ostrander, for appellant Office of the Ohio Consumers' Counsel.

Boehm, Kurtz & Lowry, David F. Boehm, Kurt J. Boehm, and Michael L. Kurtz, for appellant Ohio Energy Group.

Marc Dann, Attorney General, and Thomas W. McNamee, Duane L. Luckey, William L. Wright, and John H. Jones, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Marvin I. Resnik and Kevin F. Duffy; and Porter, Wright, Morris & Arthur, L.L.P., and Daniel R. Conway, for intervening appellees Columbus Southern Power Company and Ohio Power Company.

David C. Rinebolt and Colleen Mooney, urging reversal for amicus curiae Ohio Partners for Affordable Energy.

Scott W. Schiff & Associates and Scott W. Schiff, urging affirmance for amici curiae International Brotherhood of Electrical Workers Local 972, Parkersburg–Marietta Building and Construction Trades Council, AFL–CIO, and Ironworkers Local 787.

Michael B. Gardner, urging affirmance for amicus curiae Murray Energy Corporation.