**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Comm. Rev. of Capacity Charges of Ohio Power Co.*, Slip Opinion No. 2016-Ohio-1607.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1607

IN RE COMMISSION REVIEW OF THE CAPACITY CHARGES OF OHIO POWER COMPANY AND COLUMBUS SOUTHERN POWER COMPANY;

OFFICE OF OHIO CONSUMERS' COUNSEL, APPELLANT/CROSS-APPELLEE; OHIO POWER COMPANY, APPELLEE/CROSS-APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE/CROSS-APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Comm. Rev. of Capacity Charges of Ohio Power Co.*, Slip Opinion No. 2016-Ohio-1607.]**

*Public utilities—Commission complied with procedural requirements of R.C. 4905.26—Commission committed error in calculating energy credit— Commission orders affirmed in part and reversed in part.*

(Nos. 2012-2098 and 2013-0228—Submitted December 15, 2015—Decided April 21, 2016.)

APPEAL and CROSS-APPEAL from the Public Utilities Commission, No. 10-2929-EL-UNC.

_____

KENNEDY, J.

## I. SUMMARY

{¶ 1} This case arises from the Public Utilities Commission's approval of a capacity charge for the American Electric Power operating companies, Ohio Power Company and Columbus Southern Power (collectively, "AEP"). Competitive retail electric service ("CRES") providers that sell generation service in Ohio must ensure that they have sufficient capacity to meet customer demand. Because AEP is responsible for providing capacity to all suppliers of electricity within its service area, CRES providers who operate in the company's territory rely on AEP's capacity resources to meet their generation needs. In the orders on appeal, the commission authorized AEP to implement a new cost-based charge for capacity service that AEP offers to CRES providers.

{¶ 2} The commission orders addressed many issues, and the Ohio Consumers' Counsel ("OCC") appealed.[1] AEP also filed a cross-appeal. We have determined that AEP has demonstrated one commission error. Therefore, we affirm the commission's orders in part and reverse them in part, and remand the cause for further proceedings.

## II. FACTS AND PROCEDURAL BACKGROUND

{¶ 3} The Federal Energy Regulatory Commission ("FERC") regulates capacity markets under its preemptive authority over wholesale electricity. *See* 16 U.S.C. 824(b)(1). "Capacity" refers to the ability to supply sufficient electrical power to meet the highest level of customer demand. In order to maintain the reliability of the power grid, generators will produce more electricity than necessary to meet anticipated demand, plus a reserve margin to guard against unforeseen events.

---

[1] FirstEnergy Solutions Corp. and Industrial Energy Users-Ohio also appealed, but they subsequently dismissed their appeals.

**{¶ 4}** AEP participates in the PJM Interconnection, L.L.C. ("PJM") capacity market. *See* Pub. Util. Comm. No. 10-2929-EL-UNC, at 3 (July 2, 2012) (the "Capacity Order"). AEP is a party to the PJM Reliability Assurance Agreement ("RAA"). The RAA is a FERC-approved rate schedule that is intended to ensure that there are adequate capacity resources to maintain reliability in the region covered by PJM at the lowest possible cost. PJM Reliability Assurance Agreement, available at *http://www.pjm.com/documents/agreements.aspx* (accessed Jan. 27, 2016); *Am. Elec. Power Serv. Corp.,* 134 FERC ¶ 61,039, 2011 WL 182468, at **1 (Jan. 20, 2011).

**{¶ 5}** The RAA uses an auction process as the primary method by which capacity is purchased and priced in the PJM region. However, the RAA also contains an alternative method for meeting capacity obligations, the "Fixed Resource Requirement Alternative ("FRR Alternative"). In lieu of participating in the PJM auctions, a load-serving entity,[2] such as AEP, may elect to satisfy all capacity obligations in its service territory. AEP has chosen the FRR Alternative, and hence, it was responsible for satisfying all PJM-determined capacity-resource obligations for all loads (for both shopping and nonshopping customers) in its service territory through May 31, 2015. *See* Capacity Order at 10.

**{¶ 6}** The RAA also addresses how load-serving entities—i.e., generators like AEP that supply wholesale power to the PJM region grid—are compensated for capacity services. As noted, the RAA primarily uses auctions to set the price for capacity resources in the various PJM region. *See id.*; *Am. Elec. Power Serv. Corp.,* 134 FERC ¶ 61,039, 2011 WL 182468, at **1; RAA, Schedule 8.1. The RAA, however, also allows for capacity pricing to be determined through a "state compensation mechanism," in states that have implemented retail choice. Under

---

[2] A load-serving entity is any entity that provides electric energy to end-users located within the PJM region. RAA, Article I, Section 1.44.

this provision, the state public-utility commission determines the cost that CRES providers must pay FRR Alternative entities—such as AEP—for this capacity service. RAA Schedule 8.1, Section D.8.

{¶ 7} Since the start of the PJM capacity market, AEP had been receiving compensation from CRES providers for capacity service at market prices, as determined by PJM auctions. However, in November 2010, AEP filed an application with FERC seeking to change how it was compensated for providing capacity to CRES providers. Specifically, AEP wanted to change from auction pricing to cost-based pricing.[3]

{¶ 8} This case was opened when the commission found that an investigation was necessary to determine the impact of AEP's proposed change. Capacity Order at 3. After opening the case, the commission formally adopted a state compensation mechanism for AEP's capacity charge and set that charge based on the most recent capacity auction conducted by PJM. Capacity Order at 3-4; Pub. Util. Comm. No. 10-2929-EL-UNC, at 2 (Dec. 8, 2010).

{¶ 9} On July 2, 2012, the commission issued its order finding that AEP was entitled to recover the actual costs it incurs to supply wholesale capacity to CRES providers in its territory. According to the commission, AEP was entitled to recover its actual costs based on its status as the sole provider of capacity in its service territory.

{¶ 10} The commission found that it had statutory authority to establish a cost-based "state compensation mechanism" to price capacity—rather than rely on PJM auctions. The commission rejected the contention of some parties that it was bound by R.C. Chapter 4928 in setting the capacity charge, which governs competitive retail electric service. The commission found instead that the

---

[3] AEP relied on RAA Schedule 8.1, Section D.8, which allows an FRR Alternative Entity, if no state compensation mechanism exists, to make a filing with the FERC to seek compensation based on costs.

capacity service at issue is not a competitive retail electric service, because AEP was not providing capacity to end-use energy consumers. Rather, AEP was providing capacity to CRES providers, who resold that service to retail customers. The commission therefore determined that it could rely on R.C. 4905.04, 4905.05, and 4905.06 to approve a cost-based charge, because the transaction is appropriately characterized as an intrastate wholesale transaction.

{¶ 11} On rehearing, the commission clarified that it also had authority under R.C. 4905.26 to open the investigation in this case and to set the rate for capacity service. Pub. Util. Comm. No. 10-2929-EL-UNC, at 29 (Oct. 17, 2012).

{¶ 12} The commission also found that its decision was consistent with the FERC-approved RAA, which as previously mentioned, allows state public-utility commissions to establish a "state compensation mechanism" to price wholesale capacity. The commission also noted that a state compensation mechanism, once established, prevails over other compensation methods under the RAA.

{¶ 13} After finding that it had authority to approve a cost-based capacity charge, the commission determined that AEP's cost to provide capacity was $188.88 per megawatt-day. But because this was well above the market price for capacity in the PJM region at the time (as established by PJM auctions), the commission was concerned that AEP's capacity charge would inhibit retail shopping in its service area. For this reason, the commission ordered that CRES providers would be required to pay only the market price for capacity, under the theory that this would provide incentive for CRES providers to offer lower retail electric prices, which would promote retail competition.

{¶ 14} The commission then authorized AEP to defer recovery of the difference between the market price charged to CRES providers and the $188.88 megawatt-day price (which reflected the company's actual capacity costs) and also authorized AEP to collect carrying charges on the deferral. The commission

further ordered that an appropriate mechanism to recover the deferred charges would be established in AEP's second electric-security-plan ("ESP") case.[4]

{¶ 15} Following three rounds of rehearing, the Office of the Ohio Consumers' Counsel ("OCC") appealed the commission's decision in this case ("the capacity case") and AEP filed a cross-appeal.

## A. The Commission's ESP Order

{¶ 16} In the ESP case, the commission approved the "Retail Stability Rider" ("RSR") as the mechanism for AEP to recover its deferred capacity charges. *In re Application of Columbus S. Power Co.*, Pub. Util. Comm. Nos. 11-346-EL-SSO, 11-348-EL-SSO, 11-349-EL-AAM, and 11-350-EL-AAM (Aug. 8, 2012) (the "ESP Order").[5] The RSR was established as a "nonbypassable" rider, meaning that it is paid by both shopping and nonshopping customers in AEP's service territory. In addition, the commission authorized AEP to begin its recovery of a portion of those costs during the ESP period. The commission further instructed AEP to file an application after the ESP ended that, if approved, would allow the company to recover any remaining deferred capacity charges starting on June 1, 2015, and continuing over the following 32 months.

## B. AEP's Applications with FERC

{¶ 17} In March 2013, AEP requested that FERC confirm that the state compensation mechanism approved by the commission is consistent with the

---

[4] The commission decided the ESP case in August 2012. *In re Application of Columbus S. Power Co.*, Pub. Util. Comm. Nos. 11-346-EL-SSO, 11-348-EL-SSO, 11-349-EL-AAM, and 11-350-EL-AAM (Aug. 8, 2012). The decision was appealed to this court and was argued in May 2015. Supreme Court case No. 2013-0521. Our decision in that case is also being released today. In re Application of Columbus S. Power Co., __ Ohio St.3d __, 2016-Ohio-1608, __ N.E.3d __.

[5] On April 2, 2015, the commission approved AEP's application to recover the remaining deferred capacity charges, plus carrying charges on the deferral. *See In re Application of Ohio Power Co. to Adopt a Final Implementation Plan for the Retail Stability Rider,* Pub. Util. Comm. No. 14-1186-EL-RDR (Apr. 2, 2015). The case is currently pending before the commission on rehearing.

RAA. AEP submitted a proposed appendix to the RAA with its request. *See PJM Interconnection, L.L.C.,* 143 FERC ¶ 61,164, 2013 WL 2283427 (May 23, 2013).

{¶ 18} On May 23, 2013, FERC granted AEP's request and accepted the proposed appendix, subject to certain revisions to which AEP ultimately agreed. As revised, the appendix reflects that AEP was compensated for capacity provided to CRES providers during its ESP period at the rate established by PJM auction. FERC found that AEP's revised appendix is consistent with the RAA and does not amend the agreement itself. FERC did not, however, endorse any capacity charge above auction pricing.

{¶ 19} After FERC accepted the amended appendix, its order became final and nonappealable. Thereafter, on September 26, 2013, AEP withdrew its pending application for FERC approval of a cost-based capacity charge. *See* FERC case Nos. ER11-2183 and EL11-32.

### III. STANDARD OF REVIEW

{¶ 20} "R.C. 4903.13 provides that a [Public Utilities Commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a Public Utilities Commission decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id.*

{¶ 21} Although this court has "complete and independent power of review as to all questions of law" in appeals from the commission, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly," *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

## IV. DISCUSSION

### A. OCC's Arguments on Appeal

### 1. OCC's first proposition of law challenges the commission's reliance on R.C. 4905.26

{¶ 22} OCC argues under its first proposition of law that the commission failed to comply with all the procedural requirements of R.C. 4905.26 in the proceedings below. OCC concedes that R.C. 4905.26 gives the commission authority to investigate and hold a hearing to review rates and charges that may be unjust, unreasonable, or unlawful. But according to OCC, the plain language of the statute requires more than the notice and hearing that was provided in the proceedings below. OCC raises two specific challenges. Both lack merit.

{¶ 23} First, OCC maintains that the commission violated R.C. 4905.26 when it set a new capacity charge in this case without finding that AEP's existing capacity charge (based on PJM auction pricing) was unjust, unreasonable, or unlawful. But R.C. 4905.26 contains no such requirement. The statute provides:

> [U]pon the initiative or complaint of the public utilities commission, that any rate * * * [or] charge * * * is in any respect unjust, unreasonable, * * * or in violation of law, * * * if it appears that reasonable grounds for complaint are stated, the commission

shall fix a time for hearing and shall notify complainants and the public utility thereof.

**{¶ 24}** The plain language of the statute requires only that the commission's "initiative or complaint" allege that the rate or charge is unjust or unreasonable. It does not require any specific finding before the commission can change an existing rate, so we reject OCC's first claim that R.C. 4905.26 was violated.

**{¶ 25}** Second, OCC claims that the commission violated R.C. 4905.26 because it "never established that reasonable grounds existed for a complaint" before it held the hearing in the case below. R.C. 4905.26 states that "if it appears that reasonable grounds for complaint are stated, the commission shall fix a time for hearing and shall notify complainants and the public utility thereof." This requirement also applies when, as here, the commission itself initiates proceedings. *Allnet Communications Servs., Inc. v. Pub. Util. Comm.*, 32 Ohio St.3d 115, 117, 512 N.E.2d 350 (1987).

**{¶ 26}** The commission held an evidentiary hearing that began on April 17, 2012. The commission found that it had set forth reasonable grounds for complaint in entries issued on December 8, 2010, and March 7, 2012. In the December 8 entry, the commission initiated proceedings in this case, finding that an investigation was necessary in order to determine the impact if AEP's request with FERC to change its capacity charge from a market rate to a cost-based mechanism was approved. The commission was specifically concerned with the effect that AEP's proposed change could have on (1) the company's current capacity charges to CRES providers, (2) the manner that the company collected capacity costs through retail rates or other capacity charges, and (3) retail competition in Ohio.

**{¶ 27}** In the March 7 entry, the commission stated that evidence[6] had been presented that AEP's then-existing capacity charge might be below the company's costs to provide capacity. The commission further stated that AEP's current market-rate capacity charge could result in an unjust and unreasonable result if left unchanged.

**{¶ 28}** On appeal, OCC fails to explain exactly how these entries failed to comply with R.C. 4905.26. Unsupported legal conclusions do not demonstrate error. *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, ¶ 14-17; *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 56-57. We find that the commission set forth reasonable grounds to open the investigation and hold an evidentiary hearing. *See, e.g., Ohio Util. Co. v. Pub. Util. Comm.*, 58 Ohio St.2d 153, 159, 389 N.E.2d 483 (1979) (commission-initiated investigation based on belief that existing rates might not be reasonable under new rate law satisfied reasonable-grounds requirement); *Allnet Communications Servs., Inc. v. Pub. Util. Comm.*, 32 Ohio St.3d at 117-118, 512 N.E.2d 350 (allegation that certain charges were unreasonable and unlawful due to the unforeseen magnitude of rate increases satisfied reasonable-grounds requirement).

**{¶ 29}** In any event, OCC's real objection appears to be with *when* the commission expressly invoked R.C. 4905.26. OCC notes that the commission did not mention R.C. 4905.26 until "three months after-the-fact (in the rehearing stage)." But OCC does not explain how it was prejudiced by this delay, which it must in order to obtain a reversal. *See Myers v. Pub. Util. Comm.*, 64 Ohio St.3d 299, 302, 595 N.E.2d 873 (1992) (this court "will not reverse an order of the commission absent a showing of prejudice by the party seeking reversal").

---

[6] The evidence referenced here was submitted in support of a stipulation filed in the ESP case, which was intended to resolve both the capacity case and the ESP case. The commission initially approved the stipulation, but later decided to reject it. *See* Pub. Util. Comm. No. 10-2929-EL-UNC, at 2, 10-13 (Feb. 23, 2012).

{¶ 30} In light of the commission's clear authority under R.C. 4905.26 to investigate rates and order new rates if necessary, we reject OCC's first proposition of law.

**2. OCC's second and third propositions of law challenge**

**the commission's decision to defer the recovery of capacity costs**

{¶ 31} In its second proposition of law, OCC argues that the commission violated R.C. 4928.141 and 4928.02(A) when it allowed AEP to defer the recovery of capacity costs in this case. According to OCC, the order is unreasonable because it results in customers paying twice for capacity service.

{¶ 32} OCC argues in subsection A of its third proposition of law that the commission's decision to authorize the deferral violates R.C. 4928.02(H), which provides that it is state policy to avoid anticompetitive subsidies in the provision of retail electric service. OCC also contends that the decision to defer capacity charges violates R.C. 4928.02(L) (requiring the commission to protect at-risk populations), and R.C. 4928.06 (requiring the commission to effectuate the policy specified in R.C. 4928.02). According to OCC, the deferral provides an unlawful subsidy to CRES providers in the form of discounted capacity that will ultimately be paid by retail customers when the deferral is recovered in rates.

{¶ 33} OCC raised these same arguments before the commission. The commission, however, did not address the merits of the arguments. The commission instead found that OCC's arguments were prematurely raised and beyond the scope of the capacity case because the mechanism to recover the deferred capacity charges was not established in that case. Rather, that mechanism would be—and ultimately was—established in the ESP case.

{¶ 34} The critical problem for OCC is that none of the arguments in its second proposition of law or in subsection A of its third proposition of law refutes the commission's finding that the arguments were not yet ripe for review. Thus, OCC fails to demonstrate error in the commission's order. *See In re Application*

*of Duke Energy Ohio, Inc.*, 131 Ohio St.3d 487, 2012-Ohio-1509, 967 N.E.2d 201, ¶ 12 and ¶ 14.

**{¶ 35}** Under subsection B of its third proposition of law, OCC argues that the accounting order granting the deferral harmed utility customers. We lack jurisdiction over this argument, however, because OCC failed to set forth this claimed error in its notice of appeal. R.C. 4903.13 (establishing that the procedure for seeking reversal of a Public Utilities Commission order is through a notice of appeal "setting forth the order appealed from and the errors complained of"); *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 21.

**{¶ 36}** Finally, OCC argues in subsection C of its third proposition of law that the commission violated the regulatory principle of cost causation when it approved the capacity-charge deferrals. OCC, however, did not raise this argument on rehearing at the commission as required by R.C. 4903.10, so we lack jurisdiction to consider it now. *See Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 247-248, 638 N.E.2d 550 (1994); *Ohio Partners for Affordable Energy v. Pub. Util. Comm.*, 115 Ohio St.3d 208, 2007-Ohio-4790, 874 N.E.2d 764, ¶ 15.

### B. AEP's Arguments on Cross-Appeal

**{¶ 37}** AEP raises two arguments on cross-appeal. First, AEP challenges the commission's calculation of the energy credit to be used to reduce the company's cost-based capacity charge. Second, AEP raises a regulatory-taking argument. We find that the commission committed one instance of reversible error in calculating the energy credit.

### 1. AEP's first proposition of law challenges the inputs the commission used to calculate the energy credit

**{¶ 38}** AEP first challenges the energy credit that the commission applied to reduce the company's capacity charge. According to AEP, the commission's

methodology for calculating the credit is riddled with fundamental errors resulting in a grossly overstated energy credit, which in turn rendered the capacity charge severely understated.

### a. Background on energy credit

{¶ 39} The commission applied an energy credit so that AEP would not be overcompensated for its capacity resources. The cost of capacity is a fixed cost that includes the capital cost of building and maintaining a generation plant in a ready state, plus a fair return on the investment. The cost of operating the plant consists primarily of the cost of fuel used to generate electricity, and also includes some variable maintenance and operating costs. Revenue is generated by operating the plant (charging for capacity) and selling the power.[7]

{¶ 40} The theory behind reducing a company's capacity charge based on energy credit is that the company is likely to receive revenue from generating and selling excess power. When capacity provided by a generation asset is sold to CRES providers, the asset's potential to generate energy for sale to third parties is freed up. That is, when AEP is relieved of its responsibility to provide power to standard-service-offer customers who shop, AEP has excess energy available that it can sell to third parties (wholesale customers). This transaction is referred to as "off-system sales." The energy credit is designed to offset AEP's capacity costs with projected revenue that AEP is expected to realize from off-system sales.

### b. Matters requiring the commission's expertise receive deference

{¶ 41} We will defer to the commission "where there exists disparate competence between the respective tribunals in dealing with highly specialized issues." *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d at 110, 388 N.E.2d 1370. One area in which this court has consistently deferred to the expertise of the commission is in determining rate-of-return matters. *Ohio Edison*

---

[7] Revenue in excess of fuel costs is termed "margin."

*Co. v. Pub. Util. Comm.*, 63 Ohio St.3d 555, 561, 589 N.E.2d 1292 (1992), fn. 3. "Limited judicial review of a rate of return determination is sound" because " 'cost of capital analyses * * * are fraught with judgments and assumptions.' " *Consumers' Counsel v. Pub. Util. Comm.*, 64 Ohio St.2d 71, 79, 413 N.E.2d 799 (1980), quoting *Dayton Power & Light Co.*, Pub. Util. Comm. No. 78-92-EL-AIR, at 26 (Mar. 9, 1979).

**{¶ 42}** The energy credit implicates rate-of-return issues, so, in accordance with the cases cited above, we will defer to the commission's determination if it is reasonable.

### c. AEP's challenge to the shopping-level percentage

**{¶ 43}** The commission calculated the energy credit based in part on a forecast of the level of shopping for generation during the time the energy credit would apply. An increase in shopping decreases the energy credit and results in an increase in the company's cost-based capacity rate. Conversely, a decrease in shopping would increase the energy credit and decrease the capacity charge.

**{¶ 44}** AEP argues that the commission erred by using a static shopping level of 26.1 percent, which reflected the level of shopping in AEP's territory on March 31, 2012.[8] AEP does not dispute that 26.1 percent was the level of shopping in March 2012. Instead, AEP maintains that the commission disregarded uncontroverted evidence that shopping had increased from 26.1 percent on March 31 to 30.19 percent on April 30, 2012.

**{¶ 45}** According to AEP, this 4 percent increase would correspond to a decreased energy credit of $4.50 per megawatt-day and an increase in net capacity cost in the same amount—resulting in a capacity charge of $193.30 per megawatt-day (as opposed to the commission approved rate of $188.88 per megawatt-day). AEP also claims that the commission found that shopping was expected to

---

[8] Both the commission and AEP report the date as March 31, but AEP's evidence reflects the date as March 1.

increase even further in the months after April 2012. AEP therefore asserts that the commission's failure to account for increases in shopping that had already occurred and were expected in the future was unreasonable, unlawful, and financially harmful to the company. We disagree.

{¶ 46} The commission explained why it adopted a static shopping level of 26.1 percent in this case. Specifically, the commission found that it was appropriate to use the actual level of shopping as of a recent date, rather than a projection, because the commission expected the shopping level to fluctuate in both directions over the time period at issue. The commission reasoned that use of the static shopping level provided certainty to both the energy credit and the capacity charge. The commission also decided against a nonstatic alternative because it would have required the commission to review actual shopping levels at regular intervals and recalculate the energy credit based on those reviews.

{¶ 47} AEP has not come close to showing that the commission erred. The commission explained why it adopted a static shopping level in this case: to provide certainty to both the energy credit and the capacity charge. The pertinent section of AEP's merit brief, however, does not even mention the commission's reasoning on this issue, let alone make an argument against it.

{¶ 48} Instead, AEP places significant emphasis on testimony from one of its witnesses that shopping had increased more than 4 percent in one month. But this argument ignores two critical factors. First, a substantial fluctuation in shopping levels over one month runs counter to the commission's stated goal of providing certainty to the energy credit and the capacity charge. Second, AEP has, in essence, asked this court to reweigh the evidence and substitute its judgment for that of the commission. But that is not our function on appeal. *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 39.

{¶ 49} AEP also points to the commission's expectation that shopping would increase as a result of the decision to allow AEP to continue selling capacity to CRES providers at market price. How this supports AEP's argument is not clear to us. It was, after all, an expectation, not an affirmative factual finding.

{¶ 50} For these reasons, we reject AEP's invitation to alter the static shopping-level percentage.

### d. AEP's challenge to specific inputs used in calculating the energy credit

{¶ 51} AEP also argues under this proposition of law that the methodology used to calculate the energy credit was unreliable because it utilized a number of flawed inputs, each resulting in an overstated energy credit. AEP claims that it pointed out specific flaws in certain inputs but the commission did not substantively address AEP's arguments or identify evidence in support of the order. AEP is correct that the commission failed to address its arguments in any substantive manner. Accordingly, we remand the cause to correct this error.

{¶ 52} During the proceedings below, AEP objected to the methodology proposed by the commission's staff to calculate the energy credit. The staff's methodology was based on a model licensed by its consultant in this case, Energy Ventures Analysis, Inc. ("EVA"). AEP argued that EVA used inaccurate input data and assumptions, which resulted in an overstated energy credit. AEP specifically argued that the model (1) was not properly calibrated, which resulted in overstated gross energy margins by more than 200 percent,[9] (2) wrongly incorporated traditional off-system-sales margins, (3) failed to properly reflect AEP's System Interconnection Agreement ("pool agreement") for off-system sales, (4) overstated forecasted market prices, (5) understated fuel costs for coal

---

[9] AEP's brief reports this amount as 20 percent, not 200 percent.

units, and (6) understated heat rates for generation facilities. Capacity Order at 28-29.

**{¶ 53}** R.C. 4903.09 requires the commission to explain its decisions and identify, in sufficient detail to enable review, the record evidence upon which its orders are based. *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 312, 513 N.E.2d 337 (1987) (R.C. 4903.09 requires the commission to set forth the reasons for its decisions and prohibits summary rulings and conclusions that do not develop the supporting rationale or record); *Indus. Energy Users-Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 30 (the commission abuses its discretion if it decides an issue without record support). Yet the commission approved the staff's proposed energy credit without specifically addressing any of AEP's challenges to the inputs used in EVA's methodology. The commission's entire discussion of why it rejected AEP's challenges consists of the following:

> Upon review of all the testimony, the Commission finds that it is clear that the dispute between [AEP] and Staff amounts to a fundamental difference in methodology in everything from the calculation of gross energy margins to accounting for operation of the pool agreement. [AEP] claims that Staff's inputs to the AURORAxmp model result in an overstated energy credit, while Staff argues the Company's energy credit is far too low. Essentially, [AEP] and Staff have simply offered two quite different approaches in their attempt to forecast market prices for energy. The commission concludes that [AEP] has not shown that the process used by Staff was erroneous or unreasonable. We further find that the approach put forth by EVA is a proper means

of determining the energy credit and produces an energy credit that will ensure that [AEP] does not over recover its capacity costs.

Capacity Order at 36.

{¶ 54} The commission added little to this analysis on rehearing. In relevant part, the commission stated, "[W]e do not believe that the Company has demonstrated that the inputs actually used by EVA are unreasonable. * * * Essentially, the Commission was presented with two different methodologies for calculating the energy credit * * *. Overall, the Commission believes that EVA's approach is the more reasonable of the two * * *." Entry on Rehearing at 35-36 (Oct. 17, 2012).

{¶ 55} We find that the commission erred in two respects. First, the commission's order contains no record citations relevant to the pertinent issue, despite a claim that it reviewed all of the testimony. The commission did cite evidence on rehearing, but only for the purpose of showing that the staff's witnesses "sufficiently described [EVA's] methodology," and not for the purpose of directly addressing or refuting AEP's challenges to the inputs. *Id.* at 35.

{¶ 56} Second, the commission's analysis completely misses the mark. The dispute here is not one involving competing *methodologies*, as the commission found. Rather, the dispute is over how the staff and EVA applied their preferred methodology to calculate the energy credit. And because AEP's objection here was to the inputs and not the choice of methodologies, the commission's reference to the fact that "Staff argues the Company's energy credit is far too low," Capacity Order at 36, is not helpful. While the staff did indeed argue against AEP's proposed energy credit, AEP was not asking the commission to pick its preferred energy credit over the staff's in the context of this argument. Rather, AEP was challenging the accuracy of the staff's calculation of the energy credit by arguing that it was overstated as a result of faulty inputs. Even the

18

commission, arguing in defense of the order, seems to concede that the order falls short, when it uses 11 pages of its third merit brief to "individually address each of [AEP's] claims."

{¶ 57} In sum, the commission's error is clear and prejudicial (if the energy credit is overstated, it results in an understated capacity charge). Accordingly, we reverse this part of the order and direct the commission on remand to substantively address AEP's input arguments.

## 2. AEP's second proposition of law asserts that the commission committed a regulatory taking when it precluded AEP from recovering the difference between its cost of capacity and the auction rate

{¶ 58} AEP's second and final proposition on cross-appeal argues that any recovery that is less than its actual capacity costs would constitute a regulatory taking. In the event that the court's decision results in AEP's not recovering all of its costs, AEP requests that we rule that " 'just compensation' (the difference between [AEP's] capacity costs and the auction rate) is owed to [AEP]."

{¶ 59} This argument is merely hypothetical. Our decision in this case allows AEP to recover its actual capacity costs, which the commission calculates at a rate of $188.88 per megawatt-day. Likewise, our decision in the ESP case, also released today, does not prevent AEP from recovering its actual capacity costs. Thus, the question of a regulatory taking is hypothetical, so we refuse to address it. *See, e.g.*, *State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 82 Ohio St.3d 88, 89, 694 N.E.2d 459 (1998) (holding that abstract and hypothetical questions are inappropriate for judicial review). Therefore, we reject this proposition of law.

### *C. The Motions to Dismiss of AEP and the Commission*

{¶ 60} AEP filed an amended motion to dismiss portions of this appeal, arguing that FERC's May 23, 2013 ruling prevents this court from exercising jurisdiction over the preemption claims of Industrial Energy Users-Ohio ("IEU")

and FirstEnergy Solutions. AEP and the commission also filed a joint motion to dismiss, arguing that certain propositions of law of OCC and IEU should be dismissed. As a result of our granting the applications to withdraw the appeals of IEU and FirstEnergy Solutions and our decision herein rejecting OCC's arguments on appeal, these motions have been rendered moot.

## V. CONCLUSION

{¶ 61} For the foregoing reasons, we reverse the commission's orders in part and affirm them in part, and we remand the cause to the commission for further review.

Orders affirmed in part
and reversed in part,
and cause remanded.

O'DONNELL, LANZINGER, and FRENCH, JJ., concur.

O'CONNOR, C.J., concurs in judgment only.

PFIEFER, J., dissents with an opinion that O'NEILL, J., joins.

_____

**PFEIFER, J., dissenting.**

{¶ 62} I dissent because, as I explain in my separate opinion in the companion case released today, *In re Application of Columbus S. Power Co.*, ___ Ohio St.3d ___, 2016-Ohio-1608, __ N.E.3d __, the Public Utilities Commission ("PUCO") does not have the statutory authority to act as it did.

{¶ 63} American Electric Power ("AEP") charges all of its, for lack of a better word, regular customers for the cost of capacity, which is considered a fixed cost and includes the cost of building and maintaining its plant plus a fair rate of return on its investment. That number has been determined to be $188.88 per megawatt-day. But that rate is higher than the current market price. In order for competitive retail electric service ("CRES") providers to be able to sell their service, they need access to capacity at a rate lower than actual cost. No one will

20

pay them $188.88 per mega-watt day when the market rate from other providers is less than that.

{¶ 64} Ostensibly to promote a competitive market, the PUCO proclaimed, through its ratemaking capability, that AEP can charge CRES providers less than actual cost and that AEP's other customers will make up the difference between the actual cost of capacity and the cost the CRES providers can afford to pay. It's a great system for AEP, which doesn't care where the money comes from; it's a great system for the CRES providers, who pay less than the actual cost of capacity; and it is a horrible system for AEP's regular customers, who have to pay the actual cost of capacity and the difference between that cost and what the CRES providers pay.

{¶ 65} The cost of capacity should be borne by all entities receiving electricity from the generation plant, not just those who don't shop. The PUCO should be protecting the customers who remain loyal to their providers, not increasing their burden by forcing them to pay for somebody else's discount. It's unconscionable.

{¶ 66} The great irony of this case and its companion case is how little they matter at this point. By now, much of the rate charges at issue have been collected. This means that even if the court found against AEP, which it most assuredly did not, there would be little impact on AEP. This court, as if intentionally proving how fallible it is, has steadfastly refused to allow rates that have been collected to be refunded, even if the rates were unjustified. *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 56.

{¶ 67} I dissent.

O'NEILL, J., concurs in the foregoing opinion.

_____

Bruce J. Weston, Consumers' Counsel, and Kyle L. Kern and Maureen R. Willis, Assistant Consumers' Counsel; and Dane Stinson, for appellant/cross-appellee, Ohio Consumers' Counsel.

Mike DeWine, Attorney General, William L. Wright, Section Chief, and John H. Jones, Thomas W. McNamee, and Steven L. Beeler, Assistant Attorneys General, for appellee/cross-appellee, Public Utilities Commission of Ohio.

Matthew J. Satterwhite and Steven T. Nourse; Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, Daniel R. Conway, and L. Bradfield Hughes; Murray, Murphy, Moul, & Basil, L.L.P., and James B. Hadden; MoloLamken, L.L.P., and Jeffrey A. Lamken, for appellee/cross-appellant, Ohio Power Company.

_____